**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

GARY A. and LORI R. COOPERSTEIN,   :
on behalf of themselves and all others   :
similarly situated,   :
   :
      Plaintiffs,   :
   :   CIVIL ACTION NO. 05-194
      v.   :
   :
INDEPENDENCE BLUE CROSS,   :
MEDCO HEALTH SOLUTIONS, INC.,   :
and ADVANCEPCS (CAREMARKRX),   :
   :
      Defendants.   :

**MEMORANDUM**

BUCKWALTER, S.J.                                         August 2, 2005

        Presently before the Court are Plaintiffs' Motion to Remand (Docket No. 4), Defendants' response thereto (Docket No. 12), Plaintiffs' Reply (Docket No. 14) and Defendants' Surreply (Docket No. 19).  For the reasons stated below, Plaintiffs' Motion for Remand is denied.

**I.  BACKGROUND**

    **A.  Facts Giving Rise to the Complaint**

        Defendant Independent Blue Cross ("IBC") provided prescription drug coverage for Mr. Gary Cooperstein and Ms. Lori Cooperstein ("Plaintiffs").[1]  Prior to the summer of 2004, Defendant IBC employed Defendant Medco Health Solutions, Inc. ("Medco") as its pharmacy

---

1.  Hereinafter, the term "Plaintiffs" will refer to Mr. Cooperstein and Ms. Cooperstein, the named Plaintiffs in this action.

benefits manager.  As part of this business relationship, Defendant Medco provided Defendant

IBC administrative services in connection with Defendant IBC's prescription drug benefit

programs, including serving as Defendant IBC's authorized mail-order pharmacy for Defendant

IBC's insureds.  Defendant IBC offered incentives to its insureds to use the program by having

Medco provide a three month supply of prescription drugs while only charging the insureds the

equivalent of two months of co-payments.  By utilizing this program, Defendant IBC's insureds

reduced their co-payment obligations by 33 1/3%.

In February 2004, Defendant IBC announced that it intended to replace Defendant

Medco as its pharmacy benefits manager with Defendant AdvancePCS.  Defendant IBC

promised that this transition would not affect insureds' prescription drug benefits.

Despite Defendant IBC's assurances, the transition from Defendant Medco to

Defendant AdvancePCS was not seamless in that prescription drug refills were done incorrectly.

Specifically, certain "Brand Necessary" or "Brand Medically Necessary" prescriptions originally

filled by Defendant Medco were improperly refilled by Defendant AdvancePCS when Defendant

AdvancePCS automatically substituted generic drugs for prescriptions designated as "Brand

Necessary" or  "Brand Medically Necessary".

The transition was also not seamless in that insureds were economically harmed.

First, after the change in pharmacy benefit managers, some insureds were charged higher co-

payments than their contracts with Defendant IBC dictated.  This problem was caused by

Defendant AdvancePCS incorrectly coding generic drugs as brand drugs and improperly

handling prescriptions for which insureds had received approval after submitting Non-Formulary

Exception Requests.  Second, some insureds were prevented from using the mail-order program

2

to refill prescriptions, denying them their contractual right to receive the discount associated with

program.

### B.  Facts Regarding Service of Process

The Complaint in the instant case was filed on Wednesday, December 8, 2004 in

the Court of Common Pleas of Philadelphia County.  (Krasney Aff. ¶ 2.)[2]  After filing the

Complaint, Plaintiffs attempted to serve Defendant IBC by hand delivery of a copy of the

Complaint.  (Krasney Aff. ¶ 2.)  According to Plaintiffs, Defendant IBC had offices at

Independence Blue Cross Tower ("IBC Tower"), which is a forty-five story building located at

1901 Market Street, Philadelphia, Pennsylvania..  (Krasney Aff., Ex. B.)  Defendant IBC and

Magellan Behavioral Health were the tenants of IBC Tower at the time in question.  (Krasney

Aff. ¶ 4.)

Plaintiffs retained Mr. Alford Terry to serve the Complaint on Defendant IBC,

which he attempted to do on December 8, 2004.  (Krasney Aff. ¶ 3; Terry Aff. ¶ 1.)[3] According

to Mr. Terry, when he entered IBC Tower, he was stopped by a security guard as he passed the

guard station on the first floor.  (Terry Aff. ¶ 1.)  When Mr. Terry told the security guard he had

legal papers to serve on Defendant IBC, the guard, who identified himself as "Dave", told Mr.

Terry that he could not proceed past the guard station without the name of a specific person, who

would have to be contacted by the guard and give permission for Mr. Terry to have access to him

or her.  (Terry Aff. ¶ 2.)  When Mr. Terry repeated to Dave that he needed to deliver the

---

2.  The Affidavit of Reginald A. Krasney was filed separately.  It appears on the docket in the instant case as
Document No. 5.

3.  The Affidavit of Alford Terry was filed separately.  It appears on the docket in the instant case as Document No.
15.

Complaint to a person in the legal department at Defendant IBC, Dave did not provide a list of names and telephone extensions of persons in Defendant IBC's legal department, and he did not allow Mr. Terry to call a designated person from the security desk.  (Terry Aff. ¶ 3 - 4.)  Again, according to Mr. Terry, Dave told Mr. Terry that he would have to leave the Complaint with him, and Dave assured Mr. Terry that he would give the Complaint to the appropriate person in Defendant IBC's legal department.  (Terry Aff. ¶ 5.)  Mr. Terry, complying with Dave's instructions, left the Complaint at the desk.  (Terry Aff. ¶ 6.)  In the Affidavit of Service, Mr. Terry avers that he "personally handed to Dave (Guard) at the offices of Independence Blue Cross, 1901 Market Street, Philadelphia, Pennsylvania 19103, a true and correct copy of the Complaint issued in the above-captioned case."  (Terry Aff., Ex. C.)

On Friday, December 17, 2004, Plaintiffs' counsel filed a preliminary injunction motion in the instant matter in the Philadelphia Court of Common Pleas.  (Krasney Aff. ¶ 12.) Immediately after this motion was filed, Plaintiffs' counsel attempted to serve a copy of the preliminary injunction motion on Defendant IBC.  (Krasney Aff. ¶ 13.)  Plaintiffs' counsel was stopped by a security guard, and Plaintiffs' counsel explained that he wanted to serve legal papers on the legal department.  (Krasney Aff. ¶ 14.)  According to Plaintiffs' counsel, after the guard placed a telephone call to someone at Defendant IBC, the guard explained to Plaintiffs' counsel that no one from Defendant IBC's legal department would come down for the legal papers.  (Krasney Aff. ¶ 16.)  The guard instructed Plaintiffs' counsel that he would have to leave the legal papers at the desk and that he would make sure that the legal papers got to Defendant IBC's legal department.  (Krasney Aff. ¶ 16.)  Plaintiffs' counsel left the legal papers at the desk.  (Krasney Aff. ¶ 16.)

Mr. Terry was retained again by Plaintiffs to serve the Complaint on Defendant IBC at IBC Tower, which he did on January 13, 2005.  (Krasney Aff. ¶ 20; Terry Aff. ¶ 7.) When he was stopped by a security guard, Mr. Terry informed the guard that he had to serve legal papers.  (Terry Aff. ¶ 8.)  The guard made a telephone call and a few minutes later, Ms. Barbara McCardle came to the guard station and accepted the legal papers.  (Terry Aff. ¶ 8.)  Ms. McCardle also signed an Affidavit of Service.  (Terry Aff., Ex. A.)

On or around December 8, 2004, according to the Affidavit of Mr. David Coleman, which was filed by Defendant IBC, there was only one security guard named "Dave" assigned to IBC Tower, and it was Mr. Coleman.  (Defs.' Br., Ex. B, Coleman Aff. ¶ 3.)  Mr. Coleman was an employee of Foulk Security, not Defendant IBC.  (Defs.' Br., Ex. B, Coleman Aff.  ¶ 2.)  Mr. Coleman's uniform included a suit jacket with an "American Commercial Security Services" patch.  (Defs.' Br., Ex. B, Coleman Aff. ¶ 2.)  According to Mr. Coleman, Defendant IBC established protocols after September 11, 2001 limiting access within IBC Tower.  (Defs.' Br., Ex. B., Coleman Aff. ¶ 4.)  With respect to the service of process, Mr. Coleman was instructed to provide names and telephone extensions from a list of designated persons in the legal department to process servers seeking access to tenants.  (Defs.' Br., Ex. B., Coleman Aff. ¶ 4.)  Pursuant to the protocols, process servers seeking access to Defendant IBC were permitted to use a courtesy telephone to call the legal department, after which a person would come to the lobby to sign for and accept service.  (Defs.' Br., Ex. B, Coleman Aff. ¶ 5.) Security guards were not permitted to sign for service of process or accept service of process. (Defs.' Br., Ex. B, Coleman Aff. ¶ 6.)  According to Mr. Coleman, the security guards assigned to IBC Tower were familiar with the procedure because legal process was served on Defendant

IBC on a daily basis. (Defs.' Br., Ex. B., Coleman Aff. ¶ 6.)  Another procedure set forth by Defendant IBC required the security guards to make an entry into a log when an item was left at the security desk.  (Defs.' Br., Ex. B., Coleman Aff. ¶ 8.)

Mr. Coleman denied he signed for or accepted service of the Complaint in the instant matter on December 8, 2004.  (Defs.' Br., Ex. B., Coleman Aff. ¶ 7.)  Further, Mr. Coleman reviewed the log for December 8, 2004 and averred that there was no indication that a complaint was left at the security desk on December 8, 2004.  (Defs.' Br., Ex. B., Coleman Aff. ¶ 8.)

### C.  Procedural History

Plaintiffs filed their Class Action Complaint in the Philadelphia County Court of Common Pleas on December 8, 2004.  In Count I, Plaintiffs state a claim for breach of contract against Defendants IBC and AdvancePCS.  Plaintiffs claim that they contracted to purchase prescription drug benefit coverage from Defendant IBC and bought prescription drugs from Defendant AdvancePCS.  According to Plaintiffs, Defendants AdvancePCS and IBC improperly refilled prescriptions in violation of sound medical practice and applicable law.  Further, Plaintiffs were charged higher co-payments than they should have been under their contracts.

Count II of Plaintiffs' Complaint is a claim against Defendants IBC and AdvancesPCS for a violation of the Pennsylvania Unfair Trade Practice and Consumer Protection Law, 73 Pa. C.S.A. 201-1, *et seq*. ("UTPCPL").  In particular, Plaintiffs claim that they entered into contracts with Defendants IBC and AdvancePCS for prescription drug benefits and both Defendants failed to provide and apply those benefits properly despite representing,

6

warranting and advertising that they would.  Plaintiffs believe these actions constituted unfair methods of competition and unfair or deceptive acts within the meaning of the UTPCPL.

Plaintiffs' Count III is a claim for negligent misrepresentation against Defendants IBC and AdvancePCS.  Plaintiffs claim that Defendants IBC and AdvancePCS made misrepresentations to the insured, including that the transition from Defendant Medco to Defendant AdvancePCS would be seamless.  According to Plaintiffs, Defendants IBC and AdvancePCS knew or should have known that their statements were untrue, and Plaintiffs relied on these misrepresentations to their detriment.

Count IV of Plaintiffs' Complaint is a claim for breach of warranty against Defendants IBC and AdvancePCS.  Again, Plaintiffs claim that Defendants IBC and Advance PCS made a written warranty and implied warranty that the transition from Defendant Medco to Defendant AdvancePCS would be seamless but failed to uphold this warranty.  According to Plaintiffs, Defendants IBC and AdvancePCS improperly filled prescriptions, charged the wrong co-payments and failed to honor approved Non-Formulary Exception Requests.

In Count V, Plaintiffs aver a claim of negligence against Defendants IBC, AdvancePCS and Medco.  Plaintiffs allege that Defendant Medco failed or refused to provide Defendant AdvancesPCS with information on Non-Formulary Exceptions Requests and data reflecting which prescriptions were "Brand Necessary" or "Brand Medically Necessary."  With respect to the other defendants, Plaintiffs claim Defendants IBC and AdvancePCS failed to take the necessary steps to ensure that prescriptions were refilled correctly and that insureds were charged the accurate co-payments.

Finally, in Count VI, Plaintiffs allege a claim for bad faith, pursuant to 42 PA. C.S.A. § 8371, against Defendant IBC.  Plaintiffs claim that Defendant IBC acted in bad faith toward its insureds in failing to take steps to ensure that the transition from Defendant Medco to Defendant AdvancePCS was seamless.

The case was removed to federal court on January 14, 2005.

## II. STANDARD OF REVIEW

28 U.S.C. § 1441(b) provides in part that "[a]ny civil action of which the district courts have original jurisdiction founded on a claim or right arising under the Constitution, treaties or laws of the United States shall be removable without regard to the citizenship or residence of the parties.  28 U.S.C.A. § 1441(b)(2005).  Upon the filing of a motion to remand, it is the defendant's burden to establish the propriety of removal.  Boyer v. Snap-on Tools Corp., 913 F.2d 108, 111 (3d Cir. 1990).  "Removal statutes 'are to be strictly construed, and all doubts resolved in favor of remand.'" Id. at 111 (citations omitted).

## III. DISCUSSION

### A.  Service of Process

The requirements governing removal are set forth in 28 U.S.C. § 1446.  Pursuant to § 1446, the defendant must file the notice of removal within thirty days of the receipt by the defendant of the initial pleading.  28 U.S.C. § 1446(b)(2005).  At issue in the instant matter is whether Defendant IBC filed the notice of removal within the thirty days of its receipt of the initial pleading.  Specifically, Plaintiffs assert that they properly served the Complaint on Defendant IBC on December 8, 2004, more than thirty days before January 14, 2005, when Defendant IBC filed the notice of removal.

8

As the Supreme Court set forth in <u>Murphy Brothers, Inc. v. Michetti Pipe</u>

<u>Stringing, Inc.</u>, 524 U.S. 344 (1999), "a named defendant's time to remove is triggered by

simultaneous service of the summons and complaint, or receipt of the complaint, 'through

service or otherwise,' after and apart from service of the summons, but not by mere receipt of the

complaint unattended by formal service." <u>Id.</u> at 347-348 (quoting 28 U.S.C. § 1446(b)).  In

Pennsylvania, the applicable rule concerning service of process is Pennsylvania Rule of Civil

Procedure 402 ("Rule 402").  Pursuant to Rule 402, "original process may be served . . . (2) by

handing a copy . . . (iii) at any office or usual place of business of the defendant to his agent or to

the person for the time being in charge thereof."  PA. R. CIV. P. 402.  Pennsylvania Rule of Civil

Procedure 424 ("Rule 424") applies specifically to serving process on corporations, and pursuant

to this rule,

> [s]ervice of original process upon a corporation or similar
> entity shall be made by handing a copy to any of the following
> persons provided the person served is not a plaintiff in this
> action: (1) an executive officer, partner or trustee of the
> corporation or similar entity, or (2) the manager, clerk or other person for the time being in charge of any regular place of business

or activity of the corporation or similar entity, or (3) an agent authorized by the corporation or similar
entity in writing to receive service of process for it.  PA. R. CIV. P. 424.

In <u>Grand Entertainment Group, Ltd. v. Media Sales, Inc.</u>, 988 F.2d 476 (3d. Cir.

1993), a case which involved disputed service of process similar to this case, the Third Circuit

applied Rule 402 and examined the meaning of the phrase "person for the time being in charge"

with respect to Rule 402 and Rule 424.  <u>Id.</u> at 484-486.  In <u>Grand Entertainment</u>, the plaintiff

served process on a receptionist who was not employed by the Spanish defendants and did not

work in the offices of the Spanish defendants.  <u>Id.</u> at 485.  The receptionist was a building

employee who took messages for the tenants of the buildings when the tenants were out of the

building.  Id. at 485.  According to the notary who attempted to deliver the process, after telling

him or her that the Spanish defendants were on vacation, the receptionist accepted the process,

"which she undertook to forward to the addressee on the return from vacations."  Id. at 485.

After reviewing case law of the Pennsylvania Superior Court and Pennsylvania Commonwealth

Court, the Third Circuit held that:

> the "person for the time being in charge" of any office or
> usual place of business of the defendants for purposes of
> Pennsylvania Rule of Civil Procedure 402 must either be an
> individual with some direct connection to the party to be
> served or one whom the process server determines to be
> authorized, on the basis of her representation of authority, as
> evidenced by the affidavit of service.  A "person for the time
> being in charge" should either derive or appear to derive
> authority from the party upon whom service is attempted.  Id.
> at 486.

Specific to the facts of the case, the Third Circuit noted that the receptionist "did not work for the

Spanish defendants nor did she represent that she did."  Id. at 486.  Further, "the process server

was not led to believe that any special relationship existed between the building receptionist and

the Spanish defendants."  Id. at 486.

In making its ruling, the Third Circuit rejected the plaintiff's argument that

"person in charge" of Rule 402 means "'person in charge' of the place of business (i.e., an

individual who has access and control over the premises)."  Id. at 486.  For the service

requirements of Rule 402 to be met, the person receiving process "must at least have, or appear

to have, some position with the party to be served."  Id. at 486.  In response to the plaintiff's

contention that the Third Circuit's interpretation of Rule 402 would result in situations in which

there would be no person amenable to service at a place of business, the Third Circuit noted that

there was no Pennsylvania authority which supported the argument that a company was required to have someone to sign for service at all times.  Id. at 486.

In Cintas Corp. v. Lee's Cleaning Services, Inc., 549 Pa. 84 (1997), the Supreme Court of Pennsylvania applied Rule 424 in dicta.  Id. at 92-95.  The Pennsylvania Supreme Court wrote, "[w]hile there are few appellate cases interpreting the phrase 'person for the time being in charge' in Rule 424(2), Pennsylvania courts addressing this issue have recognized that the purpose of the rule is to satisfy the due process requirement that a defendant be given adequate notice that litigation has commenced."  Id. at 95.  The Pennsylvania Supreme Court discussed several cases, which all applied the phrase "person for the time being in charge" of Rule 424 and Rule 402, including Grand Entertainment, and found that the "common thread among these cases is that there must be a sufficient connection between the person served and the defendant to demonstrate that service was reasonable calculated to give the defendant notice of the action against it."  Id. at 95-96.  The Court went on to find that if it could have viewed all of the evidence available, it would have ruled the service as proper because the person served, who was defendant's receptionist, at the offices of the defendant "identified herself as the person in charge of the business . . . ."  Id. at 96.

Applying the case law to the facts of this case, even viewing the facts in favor of Plaintiffs, the Court finds that Plaintiffs' service of process on December 8, 2004 was improper. First, as recited above, Mr. Terry identified the security guard to whom the Complaint was given as Dave, and the only security guard named Dave working at IBC Tower was Mr. David Coleman.  Mr. Coleman testified that the security personnel at IBC Tower work for Foulk Security, not Defendant IBC.  Similar to receptionist in the Grand Entertainment case and unlike

11

the receptionist in <u>Cintas</u>, Dave did not work for Defendant.  In addition, Dave did not work in

the offices of Defendant IBC.  Although Plaintiffs argue that IBC Tower as a whole is the office

of Defendant IBC, the Court disagrees.  Dave did not work in the offices of Defendant IBC;

instead, he worked in IBC Tower which had Defendant IBC as one of its tenants.  Like the

receptionist in <u>Grand Entertainment</u> and unlike the receptionist in <u>Cintas</u>, Dave did not work in

office of the entity being served.

       Second, as written in <u>Grand Entertainment</u>, the "person in charge" language found

in Rule 402, which applies here as the same language appear in Rule 424, means that the person

served  "must at least have, or appear to have, some position with the party to be served."  988

F.2d at 486.  In this case, Dave worked on the first floor of a forty-five story building, which had

multiple tenants.  Furthermore, based on the affidavit of David Coleman, "Dave" would have

been wearing a suit jacket with a "American Commercial Security Services" patch.  Based on

these two factors, the Court believes that Mr. Coleman would not have appeared to have had a

position with Defendant IBC and not fall within the definition of "person in charge" of Rule 424.

       Third, there is no information in Plaintiffs' affidavits that the security guard

represented that he was the person in charge as was the case in <u>Cintas</u>.  As cited above, the

receptionist in <u>Cintas</u> represented to the process server that she was the person in charge.  549 Pa.

at 96.  In <u>Grand Entertainment</u>, in finding that the service was improper, the Third Circuit

specifically noted that the receptionist did not represent to the process server that she was the

person in charge.  988 F.2d at 486.  Here, there is no indication in Plaintiffs' affidavits that the

security guard made any representations that he was the person in charge.  This fact is another

reason why the Court must find the service improper.

Based on the reasons stated above, the Court finds that Plaintiffs' attempted service of the Complaint on December 8, 2004 was improper.  Therefore, Defendant IBC's filing of the notice of removal was timely.

**B.  ERISA Preemption**

The second issue involved in this Motion to Remand is whether ERISA completely preempts Plaintiffs' claims, thereby giving the Court federal subject matter jurisdiction under 28 U.S.C. § 1441(b).[4][5]  Pursuant to § 1441(b), absent diversity jurisdiction, a defendant may only remove a case when a well-pleaded complaint raises an issue of federal law.  Metropolitan Life Ins. Co. v. Taylor  481 U.S. 58, 63 (1987)(citations omitted).   "The 'well-pleaded complaint rule' is the basic principle marking the boundaries of the federal question jurisdiction of the federal district courts."  Id. at 63 (citing Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Trust for Southern Cal., 463 U.S. 1, 9-12 (1983)).  A defendant may not remove a case based on a federal defense that he may raise.  Pryzbowski v. U.S. Healthcare, Inc., 245 F.3d 266, 271 (3d. Cir. 2001).

The doctrine of complete preemption is an exception to the well-pleaded complaint rule.  Metropolitan Life, 481 U.S. at 63.  Under this exception, complaints with no federal claims on their face may still raise federal jurisdiction.  Id. at 63.  This exception applies in areas of law where Congress has so clearly preempted, that any civil complaint raising this select group of claim is necessarily federal in character.  Id. at 63-64.  One of these areas of law

---

4.  Defendants do not make a claim that diversity jurisdiction exists.

5.  Plaintiffs admit that they are participants in ERISA plans.  (Pls.' Br. at 19; Pls.' Reply at 14.)

is the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, *et seq*.
Id. at 67.

   "Congress enacted ERISA to 'protect . . . the interests of participants in employee
benefit plans and their beneficiaries' by setting out substantive regulatory requirements for
employee benefit plans and to 'provid[e] for appropriate remedies, sanctions, and ready access to
the Federal court." Aetna Health Inc. v. Davila, 124 S.Ct. 2488, 2495 (2004)(quoting 29 U.S.C.
§ 1001(b)).  ERISA's purpose is to provide a standard "regulatory regime over employee benefit
plans." Id. at 2495.  ERISA's § 502(a), which is 29 U.S.C. § 1132(a), is the "integrated
enforcement mechanism," and the section's provisions:

> set forth a comprehensive civil enforcement scheme that
> represents a careful balancing of the need for prompt and fair
> claims settlement procedures against the public interest in
> encouraging the formation of employee benefit plans. The
> policy choices reflected in the inclusion of certain remedies
> and the exclusion of others under the federal scheme would
> be completely undermined if ERISA-plan participants and
> beneficiaries were free to obtain remedies under state law that
> Congress rejected in ERISA. "The six carefully integrated
> civil enforcement provisions found in § 502(a) of the statute
> as finally enacted . . . provide strong evidence that Congress
> did not intend to authorize other remedies that it simply forgot
> to incorporate expressly." Id. at 2495 (citations omitted).

Under § 502(a), a participant or beneficiary may bring "[a] civil action . . . to recover benefits
due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to
clarify his rights to future benefits under the terms of the plan . . . ." 29 U.S.C. § 1132 (2005).  A
cause of action stating a state claim may be converted into one stating a federal claim if it falls
within ERISA's enforcement provisions and therefore is removable to federal court. Davila, 124
S.Ct. at 2496 (citing Metropolitan Life, 481 U.S. at 65-66).  "[I]f an individual, at some point in

time, could have brought his claim under ERISA § 502(a)(1)(B), and where there is no other independent legal duty that is implicated by a defendant's actions, then the individual's cause of action is completely pre-empted by ERISA § 502(a)(1)(B)."  Davila, 124 S.Ct. at 2496.

Plaintiffs argue that ERISA does not completely preempt their claims.  In their Motion to Remand, Plaintiffs write "[w]hile some class members, including named Plaintiffs, are participants in ERISA plans, Plaintiffs do not claim that an ERISA plan withheld benefits due, do not ask for enforcement of their rights created or mandated by ERISA, and do not ask for clarification of their right to future benefits under any ERISA provision."  (Pls.' Br. at 19.) Rather, Plaintiffs claim that their causes of action rest on duties independent of their ERISA plans, including the Pennsylvania Generic Equivalent Drug Law, 35 Pa. C.S.A. § 960.1, *et seq.* ("PGED Law") and UTPCPL.  (Pls.' Br. at 20.)  In addition, Plaintiffs argue that the claims do not concern a denial of benefits under the ERISA plan but instead the negligent application of the benefits.  (Pls.' Br. at 18.)  As to the PGED Law claims, because these involve the substitution of a generic drug for a prescription designated "Brand Necessary," Plaintiffs assert that they clearly implicate an independent legal duty under Pennsylvania state law and involve a treatment decision not preempted by ERISA.  (Pls.' Reply at 13-14.)

In response, Defendants claim that ERISA completely preempts Plaintiffs' causes of action.  Regarding Plaintiffs' PGED Law claim, Defendants first argue that Plaintiffs' attempt to focus on the statute is an attempt to change their complaint from the causes of action actually set forth.  (Defs.' Br. at 16.)  According to Defendants, Plaintiffs assert for the first time in the Motion to Remand that Defendant IBC owed them an independent duty under the PGED Law. (Defs.' Br. at 16.)  In addition, Defendants argue the PGED Law could not apply to Defendants

15

as it only imposes obligations on pharmacists and the statute does not allow for private cases of action.  (Defs.' Br. at 16-17.)  As to Plaintiffs' other claims, Defendants argue that ERISA preempts both state common law and statutory causes of action, including claims involving the UTPCPL.  (Defs.' Br. at 17-18.)

In Pryzbowski, the Third Circuit set forth a "framework for determining whether a case is completely preempted under § 502(a) of ERISA."  Levine v. United Healthcare Co., 402 F.3d 156, 162 (3d. Cir. 2005).  Under the framework, cases were divided into two categories. The first category included cases where the claim challenged "the administration of, or eligibility for, benefits," and these cases were considered preempted as they were within the ambit of § 502(a).  Id. at 162 (citing Pryzbowski, 245 F.3d at 273).  With respect to the second category, it included cases where the claim challenged the quality of the medical treatment performed.  These cases were not preempted.  Id. at 162 (citing Pryzbowski, 245 F.3d at 273).  In some cases, such as in Levine, a case may not fall squarely in either category and thus a court must look beyond this framework.  Id. at 162.

The Court believes that Plaintiffs' Complaint contains certain claims that are within the scope of § 502(a) because Plaintiffs essentially ask the Court to recover benefits withheld by Defendants and to enforce parts of their ERISA plan.  Specifically, Plaintiffs' Complaint contains allegations that Defendants withheld benefits to which Plaintiffs were entitled under their plans, including co-payment incentives with respect to the mail-order pharmacy programs and certain other financial benefits which were denied to them, such as those associated with Non-Formulary Exception Request approvals and those withheld because of

16

improper branding.  (Def. IBC's Notice of Removal, Ex. A. at 6-13.)[6]  Plaintiffs ask the Court to

aid in their recovery of those benefits.  (Def. IBC's Notice of Removal, Ex. A. at 20-21.)

Plaintiffs also request that the Court enforce their rights under the contract, such as restoring the

co-payment incentives with respect to the mail-order pharmacy programs.  (Def. IBC's Notice of

Removal, Ex. A. at 20-22.)  For these reasons, the Court believes that certain claims of Plaintiffs'

Complaint fall within the first category of the Pryzbowski framework, which concerns the

administration of benefits, as Plaintiffs ask the Court to restore benefits due to them under their

ERISA plan and enforce rights under their plans.  These claims do not concern treatment

decisions.  As these claims clearly fall within the ambit of § 502, they are completely preempted

and therefore the Court has federal subject matter jurisdiction.[7]

## IV.  CONCLUSION

The Court finds that Defendant IBC timely filed its notice of removal and that

certain claims of Plaintiffs are completely preempted by § 502(a) of ERISA – giving the Court

federal subject matter jurisdiction.  Therefore, Plaintiffs' Motion to Remand is denied.  An

appropriate order follows.

---

6.  Exhibit A to the Defendant IBC's Notice of Removal is Plaintiffs' Complaint.

7.  As the Court finds that the claims asking for the restoration of certain benefits and enforcement of incentive programs are within the ambit of § 502(a), there is no need for the Court to rule as to whether Plaintiffs' PGED Law and UPTCPL claims are completely preempted by ERISA.  The Court would have supplemental jurisdiction over such claims even if the Court determined that an independent duty existed.  Davis v. Smithkline Beecham Clinical Labs., 993 F.Supp. 897, 899 n.1 (E.D. Pa. 1998)("if some of the claims in this case are completely preempted, they may be removed to federal court, and the state law claims will be removed pursuant to the supplemental jurisdiction statutes, 28 U.S.C. § 1367 . . . ." ).

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

GARY A. and LORI R. COOPERSTEIN,     :
on behalf of themselves and all others     :
similarly situated,     :
     :
         Plaintiffs,     :
     :         CIVIL ACTION NO. 05-194
         v.     :
     :
INDEPENDENCE BLUE CROSS,     :
MEDCO HEALTH SOLUTIONS, INC.,     :
and ADVANCEPCS (CAREMARKRX),     :
     :
         Defendants.     :

## <u>ORDER</u>

AND NOW, this 2nd of August, 2005, upon consideration of Plaintiffs' Motion to Remand (Docket No. 4), and the responses filed thereto, it is hereby **ORDERED** that Plaintiffs' Motion is **DENIED.**

IT IS FURTHER **ORDERED** that Plaintiffs' responses to Defendants' pending Motions to Dismiss are due on or before August 16, 2005.

BY THE COURT:

_____
RONALD L. BUCKWALTER, S.J.